*Prepared and submitted by:*
Peggy Hunt (Utah State Bar No. 6060)
Chris Martinez (Utah State Bar No. 11152)
Sarah Goldberg (Utah State Bar No. 13222)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
       martinez.chris@dorsey.com
       goldberg.sarah@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>            Plaintiff,<br>    v.<br><br>M&M ANDREASEN INVESTMENTS, INC., a Utah limited liability company, MAX ANDREASEN, a Utah resident, MELANIE ANDREASEN, a Utah resident, and JOHN DOES 1-5,<br><br>            Defendants, | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S [43] MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:13-CV-462-DN<br><br>District Judge David Nuffer |

Plaintiff R. Wayne Klein, as Receiver for National Note of Utah, LC and the assets of Wayne LaMar Palmer ("Receiver") filed a Motion for Partial Summary Judgment against Max and Melanie Andreasen and Memorandum of Law in Support (First, Second, Third, and Fifth Causes of Action) (the "Receiver's Motion for Summary Judgment") on January 29, 2016.[1] Defendant's Max and Melanie Andreasen (the "Andreasens") did not file a response to the Receiver's Motion for Summary Judgment. After reviewing the Receiver's Motion for Summary

---

[1] *See* docket no. 43.

Judgment and the relevant legal authorities, the Receiver's Motion for Summary Judgment is GRANTED.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................2

BACKGROUND ............................................................................................................................2

SUMMARY JUDGMENT STANDARD OF REVIEW ................................................................4

UNDISPUTED MATERIAL FACTS ............................................................................................4

DISCUSSION ...............................................................................................................................13

    A.    Summary Judgment is Appropriate on the Receiver's First, Second and Third Causes of Action for Fraudulent Transfer. ..................................................................13

        1.    First Cause of Action—Fraudulent Transfer Under UFTA Sections 25-6-5(1)(a), 25-6-8(1)(a), and 25-6-9(2) ............................................................14

        2.    Second Cause of Action—Fraudulent Transfer Under UFTA Sections 25-6-5(1)(b), 25-6-8(1)(a), and 25-6-9(2) ............................................................16

        3.    Third Cause of Action—Fraudulent Transfer Under UFTA Sections 25-6-6(1), 25-6-8(1)(a), and 25-6-9(2) .............................................................18

    B.    Summary Judgment is Appropriate on the Receiver's Fifth Cause of Action for Unjust Enrichment ...............................................................................................19

ORDER .........................................................................................................................................20

**BACKGROUND**

In June 2012, the Securities and Exchange Commission ("SEC") commenced a Civil Enforcement Action against Wayne LaMar Palmer ("Palmer") and National Note of Utah, LC ("National Note"), alleging that Palmer had violated federal securities laws and operated National Note and its affiliated entities as a Ponzi scheme.[2] The Receiver was appointed in the Civil Enforcement Action as receiver for National Note, its affiliated entities, and the assets of

---

[2] *See SEC v. Nat'l Note of Utah, LC et al.* ("Civil Enforcement Action"), 2:12-CV-591-BSJ (D.Utah).

Palmer.[3] In that capacity, the Receiver had authority to commence suit to collect assets of the receivership estate, including fraudulent transfer actions.[4] On June 17, 2013, the Receiver commenced the present proceeding against Defendants M&M Andreasen Investments, Inc. ("M&M") and Max Andreasen seeking to avoid and recover certain transfers that National Note made to them prior to the Receiver's appointment.[5] On December 31, 2014, the Receiver filed a motion for partial summary judgment against M&M seeking to recover $49,636.99 in false profits that M&M received from National Note (the "False Profits").[6] The Court granted the motion on July 2, 2015.[7]

During discovery, the Receiver learned that M&M was a mere conduit for the Andreasens and that $43,809.47 of the False Profits was transferred directly from M&M to the Andreasens or their creditors (the "Andreasen False Profit Transfers"). Thus, on November 17, 2015, the Receiver filed an Amended Complaint adding Melanie Andreasen as a defendant.[8] The Receiver filed the present Motion for Summary Judgment on January 29, 2016, which pertains to the First, Second, Third, and Fifth Causes of Action of the Amended Complaint.[9] Specifically, the Receiver alleges that M&M was a National Note investor that received the False Profits from

---

[3] *See* Order Appointing Receiver and Staying Litigation, ECF no. 9 in Civil Enforcement Action, filed June 25, 2012.

[4] *See* Order Granting Receiver's *ex parte* Mot. for Leave to Commence Legal Proceedings, ECF no. 240 in Civil Enforcement Action, filed Mar. 29, 2013.

[5] *See* Complaint, docket no. 2.

[6] *See* Pl.'s Mot. for Partial Summ. J. and Mem. in Supp. (First, Second, Third, and Fifth Causes of Action), docket no. 19.

[7] *See* Order Granting Pl.'s Mot. for Partial Summ. J., docket no. 28. On November 12, 2015, the parties filed a Stipulated Motion to Amend Order seeking to substitute M&M Andreasen Investments, LLC for M&M Andreasen Investments, Inc. *See* docket no. 32. The Court granted the motion on November 17, 2015, and entered an amended order including the LLC as the proper party. *See* Order Granting Stipulated Mot. to Amend Order, docket no. 35; Amended Order Granting Pl.'s Mot. for Partial Summ. J. (First, Second, Third, and Fifth Causes of Action), docket no. 36.

[8] *See* docket no. 38.

[9] *See* docket no. 43.

National Note, that M&M was a mere conduit for the Andreasens that proceeded to transfer the Andreasen False Profits Transfers to the Andreasens or their creditors, and that the Andreasen False Profit Transfers are avoidable and recoverable from the Andreasens as fraudulent transfers or under a theory of unjust enrichment.[10] The Andreasens did not file a response to the Receiver's Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[12] In determining whether there is a genuine dispute of material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[13] But, when a party has properly asserted undisputed facts in accordance with Rule 56(c) of the Federal Rules of Civil Procedure and an opposing party fails to properly address or controvert those facts, the court may "consider the fact[s] undisputed for purposes of the motion[, and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"[14]

## UNDISPUTED MATERIAL FACTS

The Andreasens have not responded to the Receiver's Motion for Summary Judgment. Thus, the only issue for the court to determine is whether the Receiver is entitled to summary judgment based on the facts the Receiver alleged and the arguments he has made. The material

---

[10] *See* Amended Compl. ¶¶ 22-44, 51-57.

[11] FED. R. CIV. P. 56(a).

[12] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[13] *Id.*

[14] FED. R. CIV. P. 56(e)(2), (3).

facts set forth in the Receiver's Motion for Summary Judgment are properly asserted under Rule 56 and are considered undisputed.[15] The Undisputed Material Facts are as follows:

1. In 2007, Max Andreasen transferred $150,000 of his personal funds to M&M.[16] M&M then transferred that $150,000 to National Note.[17]

2. In 2007, National Note transferred $7,636.99 to M&M.[18]

3. In 2008, National Note transferred $18,000 to M&M.[19]

4. In 2009, National Note transferred $18,000 to M&M.[20]

5. In 2010, National Note transferred $156,000 to M&M.[21]

6. In total, National Note transferred $199,636.99 to M&M prior to the commencement of the Civil Enforcement Action (the "Investment Proceeds").[22]

7. National Note transferred $49,639.99 more to M&M than the amount that M&M transferred to National Note (as defined above, the "False Profits").[23]

8. $193,809.47 of the amount that National Note transferred to M&M (or $43,809.47 of the False Profits), was either transferred directly from M&M to the Andreasens, or was paid to the Andreasens' creditors.[24]

---

[15] *See id.* at 56(e)(2).

[16] *See* Dep. Tr. of Max Clay Andreasen dated Oct. 28, 2015 ("Andreasen Deposition") at 7-8, docket no. 43-9, filed Jan. 29, 2016.

[17] *See* Decl. of R. Wayne Klein, Receiver, in Supp. of Pl.'s Mot. for Partial Summ. J. and Mem. of Law in Supp. ("Klein Declaration") ¶ 15, docket no. 43-1, filed Jan. 29, 2016.

[18] *See id.* ¶ 16.

[19] *See id.* ¶ 17.

[20] *See id.* ¶ 18.

[21] *See id.* ¶ 19.

[22] *See id.* ¶ 20.

[23] *See id.* ¶ 21.

[24] *See id.* ¶¶ 31-34. The $43,809.47 of the False Profits that was transferred to the Andreasens is referred to herein as the "Andreasen False Profit Transfers".

9. Max Andreasen testified that the Investment Proceeds were used for home repairs, car repairs, credit card bills, dance lessons, and other "household bills."[25] He testified that the Andreasens were using the Investment Proceeds to "live on" and to pay their bills.[26] He further testified that the reason why the Investment Proceeds were routed through M&M was because it was easier to control household spending, and so the "checks [he] was getting, [he] was putting into M&M … and then writing [Melanie Andreasen] checks to take care of her household needs."[27]

10. Max Andreasen was the sole manager of M&M.[28]

11. M&M had no regular meetings, no office, and no employees.[29]

12. Max Andreasen testified that M&M was a conduit for his personal investment opportunities and then for the transfer of funds back to his household for personal use:

> Q: [M&M] was essentially a conduit for you to make these investments?
>
> A: At that point, yeah.
>
> Q: I guess, put differently, the purpose of it was to receive money from the trust and then to invest that money where you saw fit?
>
> A: Yes.
>
> Q: And then in regards to making distributions from M&M Andreasen Investment, it was solely at your discretion when a distribution was made?
>
> A: Yes.
>
> Q: I see a lot of distributions to Melanie. Is that your wife?
>
> A: Yes.
>
> * * *

---

[25] *See* Andreasen Deposition at 20-21, 31, 45, 48-59.

[26] *See id.* at 20-21, 31.

[27] *Id.* at 45.

[28] *See id.* at 19.

[29] *See id.*

    Q:    Okay. Who made the decision to make a distribution to Melanie?

    A:    Well, at that point, when the distributions were coming out, it was just so that she could pay her household bills.

    Q:    Okay.

    A:    It was just a - - basically a monthly check that I was cutting to her so that she could pay bills.

* * *

    A:    All right. So it was - - the checks were cut as needed to pay the bills?

    A:    Yes, sir.

    Q:    And by "the bills," I mean you and your wife's bills?

    A:    Yes, sir.[30]

13.     The Andreasens were the transferees of the Andreasen False Profit Transfers, and the Andreasen False Profit Transfers were transferred to them as part of a Ponzi scheme.[31]

14.     National Note raised funds from investors by issuing promissory notes.[32]

15.     From the time that M&M invested in National Note by transferring funds to National Note in 2007 through the time that it received its last transfer in 2010 (the "Applicable Period"), the returns paid to National Note investors were not financed through the success of a business, but were paid from sums obtained from other investors.[33] This is based on at least the following:

    a.     Although the NNU Enterprise did generate relatively limited income from some business sources, it had negative net income every year since at least 1995.[34]

---

[30] *Id.* at 20-21.

[31] *See id.* at 20-21, 31, 45, 48-59.

[32] *See* Klein Declaration ¶ 22; Receiver's Report on Income, Equity and Fund Transfers by National Note of Utah and Affiliated Entities dated Feb. 12, 2014 ("Receiver's Report"), docket no. 43-2, docket no. 43-3, docket no. 43-4, docket no. 43-5, filed Jan. 29, 2016.

[33] *See* Klein Declaration ¶ 23; Decl. of Richard S. Hoffman in Supp. of Pl.'s Mot. for Partial Summ. J. and Mem. of Law in Supp. ("Hoffman Declaration") ¶¶ 8-10, docket no. 43-7, filed Jan. 29, 2016.

[34] *See* Klein Declaration ¶ 23(a).

  b. Commencing in at least 1998, National Note and the NNU Enterprise had negative net equity.[35]

  c. Except for 2005 and 2006, the NNU Enterprise's operating expenses exceeded its net operating income every year from 1995 through the commencement of the Civil Enforcement Action.[36]

  d. Other than in 2005 and 2006, National Note and the NNU Enterprise had no net operating income from which to make payments to investors.[37]

  e. From 1995 through 2012, when the Civil Enforcement Action was commenced, National Note raised a total of approximately $140 million from investors.[38]

  f. From 1995 through 2012, when the Civil Enforcement Action was commenced, National Note paid a total of approximately $88 million to investors.[39]

  g. The amount that National Note owed its investors increased dramatically year after year, ballooning dramatically during the Applicable Period.[40]

    i. In 2003, National Note owed $7,632,049.31 to investors.[41]

    ii. By 2006, this amount had increased to $46,339,617.82.[42]

    iii. In 2009, this amount was $85,437,696.28.[43]

---

[35] *See id.* ¶ 23(b).

[36] *See id.* ¶ 23(c).

[37] *See id.* ¶ 23(d).

[38] *See id.* ¶ 23(e).

[39] *See id.* ¶ 23(f).

[40] *See id.* ¶ 23(g).

[41] *See id.* ¶ 23(g)(i).

[42] *See id.* ¶ 23(g)(ii).

[43] *See id.* ¶ 23(g)(iii).

        iv.        By 2012, at the time of the commencement of the Civil Enforcement Action, $110,758,395.45 was owed to investors.[44]

    h.    To the extent relevant, even in 2005 and 2006, National Note and the NNU Enterprise's net operating income obtained from limited business operations was not sufficient to make payments to investors.[45]

        i.        This total net operating income in 2005 and 2006 was in the amount of $231,395.84.[46]

        ii.        Transfers made to National Note investors during these years were in the total amount of $12,969,257.29.[47]

16.    Throughout the Applicable Period, transfers made by National Note to its investors, including the Andreasens, were sourced from cash raised from other investors.[48]

17.    Based on the following statements that it made to investors, National Note promised large, consistent returns, with little or no risk to its investors:

    a.    National Note investments had "Complete Safety of Principal";

    b.    Investors could earn "double, triple, perhaps even quadruple" their current rate of return "without sacrificing safety";

    c.    "In just a few short years," investors would be able to own their "own home free and clear, retire early and otherwise begin to enjoy the fruits of [their] labors years ahead of schedule";

---

[44] *See id.* ¶ 23(g)(iv).

[45] *See id.* ¶ 23(h).

[46] *See id.* ¶ 23(h)(i).

[47] *See id.* ¶ 23(h)(ii).

[48] *See* Hoffman Declaration ¶¶ 8-10; Klein Declaration ¶ 24; Tr. of Test. of Wayne L. Palmer dated May 30, 2011 ("Palmer Testimony") at 147:17-149:6, 152:10-153:2 (admitting new investor money was used to pay investors).

  d. "National Note has a perfect payment record. It has never been late on a single investor payment, and has never lost a nickel of investor capital";

  e. Investor money "left to compound at National Note, will double every six years";

  f. "Double digit returns, Guaranteed. – No worries about reduction in earnings";

  g. "Monthly payments, Guaranteed – No guesswork about when payments arrive";

  h. "Safety of Principal, Guaranteed – No fears about losing money";

  i. "When National Note says 'No Worries' it literally means no worries";

  j. "National Note provides its clients with the rewards of real estate investing, while insulating them from the risks and responsibilities";

  k. National Note's investments are safe because "the value of the property" securing the investment is "always much higher than the amount invested (often two dollars or more of equity for every dollar funded";

  l. "National Note's clients are provided a proven way to steadily compound their money, systematically doubling it every 6 years";

  m. "Since [the investor] ultimately has real estate backing [his or her] funds at our company, [the investor] is assured of full payment."[49]

18. National Note generally made payments to its investors through 2011, thus creating the false impression that profits were being earned, and thereby attracting additional investors to the scheme.[50]

---

[49] Klein Declaration ¶¶ 25(a)-(m).

19.     National Note and the NNU Enterprise were insolvent from at least 1998 through the commencement of the Civil Enforcement Action in June 2012,[51] including the entire Applicable Period.[52]

20.     During the entire Applicable Period, National Note intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.[53]

21.     Throughout the Applicable Period, National Note was insolvent because its debts were greater than all of its assets at a fair valuation. Furthermore, throughout the Applicable Period, National Note was unable to pay its debts as they came due.[54]

   a.     As of December 31, 2004, the sum of National Note's liabilities exceeded the fair value of its assets by approximately $3.2 million. National Note's insolvency continued to increase during the Applicable Period. By June 30, 2012, the sum of National Note's liabilities exceeded the fair value of its assets by approximately $68 million.[55]

   b.     National Note's primary source of recorded income was "interest income" payable from note receivables reportedly owed by National Note's affiliates (the "Affiliate Notes Receivable").[56]

   c.     National Note's primary expense was interest owed to its investors on the investors' respective promissory notes.[57]

---

[50] *See id.* ¶ 26

[51] *See id.* ¶ 27; Hoffman Declaration; Receiver's Report.

[52] *See* Hoffman Declaration; Receiver's Report.

[53] *See* Hoffman Declaration; Klein Declaration; Receiver's Report.

[54] *See* Hoffman Declaration ¶ 7; Receiver's Report.

[55] *See* Hoffman Declaration ¶ 7(a).

[56] *See id.* ¶ 7(b).

   d. The majority of the "interest income" reported by National Note on account of the Affiliate Notes Receivable was never actually collected in cash from the affiliates or otherwise.[58]

   e. National Note's affiliates did not generate sufficient operating income to actually make payments on the Affiliate Notes Receivable. The amount of interest income that was actually paid by affiliates to National Note in cash during the Applicable Period was $9,076,510, as compared to the total amount of interest reported to be owed on the Affiliate Notes Receivable which was recorded as being in the amount of $53,660,632.[59]

   f. National Note did not have the ability to pay obligations to its investors from the cash it was collecting from its affiliates. During the Applicable Period, there was at least a $28 million shortfall between National Note's recorded revenue from the Affiliate Notes Receivable and the amount that was owed to National Note's investors.[60]

22. As of the date of the commencement of the Civil Enforcement Action, at least 554 investors had received less from National Note than the amount that they invested, and a large percentage of those investors received absolutely no return.[61]

23. From his investigation to date, the Receiver anticipates that allowable claims against the Receivership Estate for net principal losses will exceed $45.3 million.[62]

---

[57] *See id.* ¶ 7(c).

[58] *See id.* ¶ 7(d).

[59] *See id.* ¶ 7(e).

[60] *See id.* ¶ 7(f). This does not take into account payments of principal made to investors. Not only was National Note unable to pay the interest it owed to its investors as it came due, National Note was unable to pay its principal repayment obligations as they came due. *See id.*

[61] Klein Declaration ¶ 28.

[62] *Id.* ¶ 29.

24.     As of this time, the Receiver anticipates that returns to those investors who have allowable claims will be far less than 100% return of their principal investment.[63]

## DISCUSSION

### A.     Summary Judgment is Appropriate on the Receiver's First, Second and Third Causes of Action for Fraudulent Transfer.

In his First, Second and Third Causes of Action, the Receiver asserts that the Andreasen False Profit Transfers are avoidable and recoverable under the Utah Fraudulent Transfer Act ("UFTA"), codified in relevant part at Utah Code sections 25-6-5(1), 25-6-6(1), 25-6-8(1)(a), and 26-6-9(2).[64] UFTA section 25-6-5(1) states that a fraudulent transfer exists as to a creditor whose claim arose before or after the transfer was made if the debtor made the transfer:

(a)     with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b)     without receiving a reasonably equivalent value in exchange for the transfer or obligation; and the debtor:

(i)     was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii)     intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.[65]

UFTA section 25-6-6(1) provides that a transfer is fraudulent as to a creditor whose claim arose before the transfer was made if:

(a)     the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

---

[63] *See id.* ¶ 30.

[64] *See* Amended Compl. ¶¶ 22-44.

[65] Utah Code § 25-6-5(1).

    (b)    the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation.[66]

If a transfer is a fraudulent transfer under either UFTA section 25-6-5(1)(a) or (b) or under UFTA section 25-6-6(1), it is avoidable under UFTA section 25-6-8(1)(a).[67] Moreover, UFTA section 25-6-9(2) allows a creditor to "recover judgment for the value of the asset transferred[.]"[68]

For the reasons discussed below, the Andreasen False Profit Transfers constitute fraudulent transfers under UFTA sections 25-6-5(1)(a), 25-6-5(1)(b), and 25-6-6(1) that are avoidable under UFTA section 25-6-8(1)(a) and are recoverable from the Andreasens under UFTA section 25-6-9(2). Thus, the Receiver's Motion for Summary Judgment is GRANTED as to the Receiver's First, Second and Third Causes of Action.

    **1.    First Cause of Action—Fraudulent Transfer Under UFTA Sections 25-6-5(1)(a), 25-6-8(1)(a), and 25-6-9(2)**

In the First Cause of Action, the Receiver asserts that the Andreasen False Profit Transfers are fraudulent transfers under UFTA section 25-6-5(1)(a) and that as such they are avoidable and recoverable under UFTA sections 25-6-8(1)(a) and 25-6-9(2).[69] Typically, in determining whether "actual intent" exists under UFTA section 25-6-5(1)(a), the "badges of fraud" set forth in UFTA section 25-6-5(2) are applied.[70] In Ponzi scheme cases, however, "actual intent" under UFTA section 25-6-5(1)(a) is established by the mere existence of the Ponzi scheme itself.[71] Thus, to avoid and recover transfers as fraudulent transfers under UFTA

---

[66] *Id*. § 25-6-6(1).

[67] *See id*. § 25-6-8(1)(a).

[68] *Id*. § 25-6-9(2).

[69] *See* Amended Compl. ¶¶ 22-28.

[70] *See* Utah Code § 25-6-5(2).

[71] *See Miller v. Kelley*, 2014 WL 5437023, *5 (D.Utah Oct. 27, 2014) ("Under the UFTA, once it is established that a debtor acted as a Ponzi scheme, *all* transfers by that entity are presumed fraudulent.") (emphasis in original).

section 25-6-5(1)(a), the Receiver need only prove: (1) that the enterprise was a Ponzi scheme; (2) that the Andreasens received more in payments from the enterprise than they invested; and (3) that the Andreasens were the actual transferees.[72]

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from the principal sums of newly attracted investments."[73] "In order to show that an investment scheme is a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors."[74] The following factors are also "typically present" in Ponzi schemes: "the promise of large returns; the promise of returns with little to no risk; the promise of consistent returns; the delivery of promised returns to earlier investors to attract new investors; the general insolvency of the investment scheme from the beginning; the secrecy, exclusivity, and/or complexity of the investment scheme; and the general stability of the investment scheme, among other factors."[75]

Additionally, a transferee of a transfer does not include an entity that serves as a mere conduit for the actual transferee.[76] The actual transferee is the entity or individual that exercises dominion or control of the transferred funds.[77] Those who act as mere conduits, "possessors" or "holders" of money are not initial transferees.[78] Instead, the transferee is the person who has control over the funds to "put the money to [its] own purposes."[79]

---

[72] See id.

[73] *In re M & L Business Mach. Co., Inc.*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (internal quotations omitted).

[74] *SEC v. Mgmt. Sols., Inc.*, 2013 WL 4501088, *19 (D.Utah Aug. 22, 2013).

[75] Id.

[76] See *In re Ogden*, 314 F.3d 1190, 1196 (10th Cir. 2002).

[77] See id.

[78] See id. at 1202.

[79] *In re First Sec. Mortg. Co.*, 33 F.3d 42, 44 (10th Cir. 1994).

Undisputed Material Facts Nos. 14-19 establish that National Note was operated as a Ponzi scheme based on the characteristics discussed above.[80] Undisputed Material Facts Nos. 1-7 establish that the Andreasens received more from the enterprise than they invested.[81] Furthermore, Undisputed Material Facts Nos. 8-13 establish that M&M was a mere conduit of the Andreasens, that the funds transferred to it and received by it from National Note were under the complete control of the Andreasens, and that the Andreasens are the transferees of the Andreasen False Profit Transfers, as the Andreasen False Profit Transfers were paid to or used for the benefit of the Andreasens pursuant to the sole direction of the Andreasens.[82] Accordingly, the Andreasen False Profit Transfers are fraudulent transfers under UFTA section 25-6-5(1)(a).[83] These fraudulent transfers are avoidable under UFTA section 25-6-8(1)(a),[84] and the Andreasen False Profit Transfers are recoverable from the Andreasens under UFTA section 25-6-9(2).[85] Thus, summary judgment for the Receiver is appropriate on the Receiver's First Cause of Action.

### 2. Second Cause of Action—Fraudulent Transfer Under UFTA Sections 25-6-5(1)(b), 25-6-8(1)(a), and 25-6-9(2)

In the Second Cause of Action, the Receiver asserts that the Andreasen False Profit Transfers are fraudulent transfers under UFTA section 25-6-5(1)(b) and that as such they are avoidable and recoverable under UFTA sections 25-6-8(1)(a) and 25-6-9(2).[86] Under UFTA section 25-6-5(1)(b), a transfer is fraudulent if it is not made for "reasonably equivalent value" and the transferor intended, believed, or reasonably should have believed that he would incur

---

[80] *See supra* at 7-11, ¶¶ 14-19.

[81] *See id.* at 5, ¶¶ 1-7.

[82] *See id.* at 5-7, ¶¶ 8-13.

[83] *See* Utah Code § 25-6-5(1)(a).

[84] *See id.* § 25-6-8(1)(a).

[85] *See id.* § 25-6-9(2).

[86] *See* Amended Compl. ¶¶ 29-36.

debts beyond his ability to pay as they became due.[87] "Value" is defined in UFTA section 25-6-4.[88] It is well established that false profits paid in a Ponzi scheme can never be "value" as defined in UFTA section 25-6-4, much less "reasonably equivalent value" because payments "in excess of amounts invested are considered fictitious profits," they are not a "return on legitimate investment activity."[89] The payment of these "fictitious profits" does not benefit the enterprise but instead depletes the scheme's resources further.[90] "Accordingly, the payments [are] not for reasonably equivalent value and, therefore, [are] fraudulent transfers."[91]

The Receiver has undisputedly established that National Note was a Ponzi scheme,[92] that the Andreasens received more from the enterprise than they invested,[93] and that M&M was a mere conduit for the Andreasens.[94] As a result, National Note did not receive anything of value in exchange for the transfers to the Andreasens in excess of their principal investment.[95] Furthermore, based on Undisputed Material Facts No. 21, it is clear that National Note intended to incur, or believed or reasonable should have believed that it would incur, debts beyond its ability to pay as they became due.[96] Accordingly, the Andreasen False Profit Transfers are fraudulent transfers under UFTA section 25-6-5(1)(b).[97] These fraudulent transfers are avoidable

---

[87] *See* Utah Code § 25-6-5(1)(b).

[88] *See id*. § 25-6-4.

[89] *Wing v. Dockstader*, 2010 WL 5020959, *5 (D.Utah Dec. 3, 2010).

[90] *Id*.

[91] *Id*.

[92] *See supra* at 7-11, ¶¶ 14-19.

[93] *See id*. at 5, ¶¶ 1-7.

[94] *See id*. at 5-7, ¶¶ 8-13.

[95] *See Klein v. Bruno*, 2013 WL 6158752, *3 (D.Utah Nov. 25, 2013).

[96] *See supra* at 11-12, ¶ 21.

[97] *See* Utah Code § 25-6-5(1)(b).

under UFTA section 25-6-8(1)(a),[98] and are recoverable from the Andreasens under UFTA section 25-6-9(2).[99] Thus, summary judgment for the Receiver is appropriate on the Receiver's Second Cause of Action.

### 3. Third Cause of Action—Fraudulent Transfer Under UFTA Sections 25-6-6(1), 25-6-8(1)(a), and 25-6-9(2)

In the Third Cause of Action, the Receiver asserts that the Andreasen False Profit Transfers are fraudulent transfers under UFTA section 25-6-6(1) and that as such they are avoidable and recoverable under UFTA sections 25-6-8(1)(a) and 25-6-9(2).[100] Under UFTA section 25-6-6(1), a transfer is fraudulent if it is not made for "reasonably equivalent value" and the debtor was insolvent or became insolvent as a result of the transfer or obligation.[101] "Insolvency," is defined, in relevant part, in UFTA section 25-6-3 as follows:

> (1) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
>
> (2) A debtor who is generally not paying his debts as they become due is presumed to be insolvent.[102]

The Receiver has undisputedly established that National Note was a Ponzi scheme,[103] and that the Andreasens received more from National Note than they invested.[104] Accordingly, the transfers of the Andreasen False Profit Transfers to the Andreasens were not "value."[105] Furthermore, based on Undisputed Material Facts No. 21, National Note was insolvent at all

---

[98] *See id.* § 25-6-8(1)(a).

[99] *See id.* § 25-6-9(2).

[100] *See* Amended Compl. ¶¶ 37-44.

[101] *See* Utah Code § 25-6-6(1).

[102] *Id.* § 25-6-3.

[103] *See supra* at 7-11, ¶¶ 14-19.

[104] *See id.* at 5-7, ¶¶ 1-13.

[105] *See* Utah Code § 25-6-4.

relevant times.[106] Accordingly, the Andreasen False Prof Transfers are fraudulent transfers under UFTA section 25-6-6(1).[107] These fraudulent transfers are avoidable under UFTA section 25-6-8(1)(a),[108] and are recoverable from the Andreasens under UFTA section 25-6-9(2).[109] Thus, summary judgment for the Receiver is appropriate on the Receiver's Third Cause of Action.

### B. Summary Judgment is Appropriate on the Receiver's Fifth Cause of Action for Unjust Enrichment.

In his Fifth Cause of Action, the Receiver asserts that the he may recover the Andreasen False Profit Transfers from the Andreasens because allowing the Andreasens to keep the Andreasen False Profit Transfers would be inequitable as an unjust enrichment.[110] Under the theory of unjust enrichment, a plaintiff must prove: "(1) a benefit conferred on the [defendant]; (2) an appreciation or knowledge by the [defendant] of the benefit; and (3) the acceptance or retention by the [defendant] of the benefit under such circumstances as to make it inequitable for the [defendant] to retain the benefit without payment of its value."[111]

There is no dispute that the Andreasen False Profit Transfers conferred a benefit on the Andreasens, and that the Andreasens have an appreciation of that benefit.[112] Furthermore, Undisputed Material Facts Nos. 22-24 establish that allowing the Andreasens to retain the Andreasen False Profit Transfers would be inequitable.[113] Prior to the Receiver's appointment, at

---

[106] *See supra* at 11-12, ¶¶ 21.

[107] *See* Utah Code § 25-6-6(1).

[108] *See id*. § 25-6-8(1)(a).

[109] *See id*. § 25-6-9(2).

[110] *See* Amended Compl. ¶¶ 51-57.

[111] *Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754 (internal quotations omitted).

[112] *See supra* at 5-7, ¶¶ 1-13.

[113] *See id*. at 12-13, ¶¶ 22-24.

least 554 investors received less from National Note than the amount that they invested, and a large percentage of those investors received absolutely no return of the money that they invested.[114] These investors are anticipated to receive far less than 100% of the principal amount that they invested back through the receivership estate.[115] It would be inequitable to allow the Andreasens to profit from this fraudulent enterprise at the expense of these investors. Thus, summary judgment for the Receiver is appropriate on the Receiver's Fifth Cause of Action.

## ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Receiver's Motion for Summary Judgment[116] is GRANTED.

DATED: April 26, 2016

BY THE COURT

_____
David Nuffer
United States District Court Judge

---

[114] *See id*. at 12, ¶ 22.

[115] *See id*. at 13, ¶ 24.

[116] *See* docket no. 43.